CHAPMAN & DRAKE

v.

Granville HARRINGTON.

Supreme Judicial Court of Maine.

Argued May 5, 1988.
Decided July 12, 1988.

Jeffrey M. White, (orally), Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, for plaintiff.

James M. Bowie, (orally), Hunt, Thompson & Bowie, Portland, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, SCOLNIK and CLIFFORD, JJ.

GLASSMAN, Justice.

The defendant, Granville Harrington, appeals a judgment entered by the Superior Court (Lincoln County) on a jury verdict awarding damages of $49,594.22 to the plaintiff insurance company, Chapman & Drake, for Harrington's breach of a noncompetition agreement entered into by the parties. We hold that the agreement is enforceable, that the amount of damages awarded is supported by the evidence, and that the trial court properly denied Harrington's motion for a new trial. Accordingly, we affirm the judgment.

During the spring of 1979, Harrington while working for another insurance company began negotiating with Chapman & Drake about the possibility of selling insurance for that company in his hometown area of Bath. Competent evidence would allow the jury to have found that the parties specifically negotiated the noncompetition agreement now in dispute and that the agreement was tailored to reflect concerns articulated by Harrington. Harrington accepted the modified noncompetition agreement and agreed that $5,000 of his annual salary would be compensation for the limits imposed on him by that agreement.

Between July 30, 1979, and July 28, 1983, Harrington worked as an insurance salesperson for Chapman & Drake. The company provided over 100 of its customer accounts for him to service, with a premium value of over $170,000. Harrington had access to all relevant information not only on the accounts he personally serviced but also on all the company accounts in its computer files. That information included reports by salespersons as well as the renewal and expiration dates on the accounts. After Harrington left Chapman & Drake in 1983, he established his own insurance business in the Bath area and obtained accounts from a number of former Chapman & Drake clients.

On July 11, 1984, Chapman & Drake filed a multi-count suit against Harrington claiming that he had violated the noncompetition agreement that was part of his employment contract, and seeking damages on the alternative grounds that Harrington had breached the noncompetition agreement or that he had been unjustly enriched by his conduct. After hearing all the evidence, the trial court ruled as a matter of law that the noncompetition agreement in dispute did not violate public policy. By special verdict the jury found that Harrington had breached the contract and awarded damages to Chapman & Drake. After a hearing, the trial court denied Harrington's motion for a new trial, and Harrington appeals.

I.

Harrington first contends that the trial court erred in its determination that the noncompetition agreement of the parties did not violate public policy. He argues that the noncompetition agreement as applied "has no legitimate basis in the reasonable business needs of the employer," that its lack of geographic limits is overbroad, and that the five-year span for which Chapman & Drake seeks damages "is unnecessarily long." We disagree.

The disputed covenant as specifically negotiated by the parties provides:

For a period of five (5) years after Employee shall cease to be employed by employer for any reason, Employee shall not, directly or indirectly, alone or as a partner, employee, officer, director or stockholder of another canvass, solicit or accept any insurance business from any person, firm or corporation (whether in person, by mail, by telephone or otherwise) that is or was during the term of Employee's employment hereunder a customer or prospective customer of Employer.

Recognizing that the enforcement of an employee's covenant not to compete with his former employer has the potential for greatly restricting that employee's capacity to support himself in his chosen occupation,

we have emphasized that such covenants "are contrary to public policy and will be enforced only to the extent that they are reasonable and sweep no wider than necessary to protect the business interests in issue." *Lord v. Lord*, 454 A.2d 830, 834 (Me.1983). *See also Roy v. Bolduc*, 140 Me. 103, 106–07, 34 A.2d 479, 480 (1943). Whether a noncompetition agreement is reasonable is a question of law to be determined by the court. *See South Bend Consumers Club v. United Consumers Club*, 572 F.Supp. 209, 213 (N.D.Ind.1983), *appeal dismissed*, 742 F.2d 392 (7th Cir.1984); *Instrumentalist Co. v. Band, Inc.*, 134 Ill. App.3d 884, 891, 89 Ill.Dec. 530, 536, 480 N.E.2d 1273, 1279 (App.Ct.1985). The reasonableness of a specific covenant must ultimately be determined by the facts developed in each case as to its duration, geographic area and the interests sought to be protected. *See Mantek Div. of NCH Corp. v. Share Corp.*, 780 F.2d 702, 709 (7th Cir.1986); *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 382–83 (Iowa 1983); *American Security Services, Inc. v. Vodra*, 222 Neb. 480, 488, 385 N.W.2d 73, 79 (1986).

Since the reasonableness of the noncompetition agreement depends upon the specific facts of the case, *see, e.g., American Security Services, Inc. v. Vodra*, 222 Neb. at 488, 385 N.W.2d at 79, we assess that agreement only as Chapman & Drake has sought to apply it and not as it might have been enforced on its plain terms. Here, Chapman & Drake has not sought equitable relief imposing any restrictions on Harrington's freedom to sell insurance, but instead has filed only a breach of contract action seeking common law damages. Further, the company has not requested damages for any "prospective customers" or for those customers who left Chapman & Drake *before* Harrington's departure. The company claims damages only for the approximately 130 accounts representing customers of Chapman & Drake at the time Harrington left that company who later bought insurance policies from Harrington after he set up his own business.

■ Addressing Harrington's argument that the agreement as applied is unreasonable, we note as an initial matter that protecting the employer simply from business competition is not a legitimate business interest to be advanced by such an agreement. *See Marine Contractors Co. v. Hurley*, 365 Mass. 280, 287, 310 N.E.2d 915, 920 (1974); *Boisen v. Petersen Flying Service, Inc.*, 222 Neb. 239, 246, 383 N.W.2d 29, 34 (1986). *See also 6A Corbin on Contracts* § 1394, at 100 (1962). A covenant not to compete may be reasonable, however, when the employee during his term of employment has had substantial contact with his employer's customers and is thereby in a position to take for his own benefit the good will his employer paid him to help develop for the employer's business. *See Budget Rent-a-Car Corp. v. Fein*, 342 F.2d 509, 516 (5th Cir.1965); *Boisen v. Petersen Flying Service, Inc.*, 222 Neb. at 244, 383 N.W.2d at 33; *Lakeside Oil Co. v. Slutsky*, 8 Wis.2d 157, 162, 98 N.W.2d 415, 419 (1959). *See also 6A Corbin on Contracts* § 1394, at 98. There is further support for the reasonableness of a covenant not to compete when the employee limited thereby has had access to his employer's confidential information, including customer lists, and is in a position after leaving his employer to take advantage of that information. *See Boisen v. Petersen Flying Service, Inc.*, 222 Neb. at 246, 383 N.W.2d at 34; *Kelite Products Inc. v. Brandt*, 206 Or. 636, 651, 294 P.2d 320, 327 (1956); *6A Corbin on Contracts* § 1394, at 97; Blake, *Employee Agreements not to Compete*, 73 Harv.L.Rev. 625, 670–71 (1960).

■ During Harrington's employment as an insurance agent for Chapman & Drake, he not only had significant contact with its customers over a period of four years, but also had access to its entire customer list, the policies they held, and the expiration dates on those policies. Harrington's substantial customer contacts on behalf of Chapman & Drake as well as the confidential information Chapman & Drake entrusted to him placed him in an especially strong position when he resigned from the company to obtain its customers for his own

business. Given the nature of that risk, Chapman & Drake did not act unreasonably by using a noncompetition agreement to limit Harrington's freedom, if he should leave the company's employ, to pursue both those customers he had personally served and those whose names were in the Chapman & Drake customer lists available to him. *See Farmers Insur. Exchange v. Fraley,* 80 Or.App. 117, 119, 720 P.2d 770, 771 (App.Ct.1986); *Caine & Estes Insur. Agency v. Watts,* 278 S.C. 207, 208–10, 293 S.E.2d 859, 860–61 (1982).

We also reject Harrington's argument that the agreement is of unreasonable scope since it sets forth no geographic limits. The initial noncompetition agreement proposed by Chapman & Drake prohibited Harrington, after leaving the company, from working in the insurance business in Lincoln, Sagadahoc, or Kennebec County. Harrington rejected that proposal on the ground that should he leave Chapman & Drake he wanted to remain free to sell insurance in his hometown area of Bath. The parties then agreed on the instant noncompetition agreement that does not limit Harrington geographically but simply prohibits him from soliciting or accepting Chapman & Drake customers. Thus, rather than setting forth an unreasonably broad geographic limitation on Harrington's freedom to sell insurance, the provision was reasonably tailored by the parties to allow Harrington to continue in his occupation in a location of his choice. In that context, we see nothing unreasonable in the absence of geographic limits in the covenant. *See Caine & Estes Insur. Agency, Inc. v. Watts,* 278 S.C. at 208–10, 293 S.E.2d at 860–61.

Finally, the five-year prohibition from soliciting or accepting Chapman & Drake customers does not make unreasonable the noncompetition agreement as Chapman & Drake has sought to enforce it. Courts have looked with disfavor on the noncompetition agreements of an employer and employee that have spanned periods as long as five years after an employee discontinues working for that employer. *See, e.g., Welcome Wagon, Inc. v. Morris,* 224 F.2d 693, 699–700 (4th Cir.1955); *Rich-*

*mond Brothers, Inc. v. Westinghouse Broadcasting Co.,* 357 Mass. 106, 110, 256 N.E.2d 304, 307 (1970). In this case, however, the burdensome character of the five-year term is lessened because the agreement does not preclude Harrington from selling insurance but only from doing business with persons who were Chapman & Drake's customers at the time Harrington discontinued his employment with that company. *See American Security Services, Inc. v. Vodra,* 222 Neb. at 490, 385 N.W.2d at 80; *Bates Chevrolet Corp. v. Haven Chevrolet, Inc.,* 13 A.D.2d 27, 30, 213 N.Y.S.2d 577, 581 (1961).

As enforced, the five-year limit also is reasonably related to protecting recognized legitimate business interests of Chapman & Drake. Ernest Edgerly, the vice-president of Chapman & Drake, testified at trial that an insurance salesperson like Harrington dealt primarily with the company's commercial policies—business and fire as well as workers' compensation—which were not renewed automatically but required significant customer contact to obtain the renewal. The company thus sought longer durational limits on those agents who sold commercial as opposed to self-renewing insurance policies. Edgerly further testified that the five-year limit also reflected the company's occasional issuance of three-year commercial policies. Since some of those policies would not have been renewable for a year or two after an employee subject to the covenant left the company, the five-year limit allowed Chapman & Drake to obtain at least a single renewal that could then run its full three years before the employee could pursue that customer's business. On these facts, we see nothing excessive in the agreement's five-year term.

Because of the limited enforcement sought by Chapman & Drake and the facts peculiar to Harrington's employment relationship with that company, we hold that the noncompetition covenant reasonably advanced Chapman & Drake's legitimate business interests and did not overly burden Harrington's freedom to pursue his occupation in an area of his choosing after

leaving Chapman & Drake. Accordingly, we affirm the determination of the trial court that the agreement is reasonable and does not violate public policy.

## II.

Harrington raises two additional contentions, first that the damage award was not supported by adequate evidence in the record, and second that the trial court abused its discretion by refusing to order a new trial because of the failure of Chapman & Drake to comply with certain discovery requests. We find no merit in either argument.

Through the testimony of its vice-president, Chapman & Drake itemized the damages it sought from the loss of approximately 130 customers to Harrington after he left the company. The computations of those damages were set forth in exhibit 22, which listed, *inter alia,* all of the lost customers, when Chapman & Drake closed its books on them, what premiums those customers paid on the policies they held with Chapman & Drake at the time they left, and what the commission had been on those policies. Edgerly then computed the total damages for each lost customer by multiplying that yearly commission by the number of years between the time Chapman & Drake considered the account lost and the termination on July 28, 1988 of the five-year limitation set forth in the agreement. The vice-president subtracted from the overall total a percentage reflecting the company's five percent estimated annual loss of business through normal turnover. He also subtracted a figure for the yearly amount Chapman & Drake estimated it would spend servicing the lost accounts. Those computations left a total of $49,594.22 sought in damages—the same amount the jury ultimately awarded. The court admitted exhibit 22 in evidence over the objection of Harrington.

■ Harrington argues that exhibit 22 setting forth the computations contained numerous errors and thus prevented the jury from having adequate evidence on which to base its damages award.[1] We have made clear that

damages are not recoverable when uncertain, contingent, or speculative. Damages must be grounded on established positive facts or on evidence from which their existence and amount may be determined to a probability. They must not rest wholly on surmise and conjecture.

*Decesere v. Thayer,* 468 A.2d 597, 598 (Me. 1983) (quoting *Michaud v. Steckino,* 390 A.2d 524, 530 (Me.1978)). Furthermore, "[a]n award of damages will be disturbed on appeal 'only when it is plain that there is no rational basis upon which the amount of the award may be supported[.]'" *Lawrence v. Saunders,* 539 A.2d 1102, 1103 (Me.1988) (quoting *Hood v. Mercier,* 523 A.2d 572, 574 (Me.1987)).

■ Edgerly's testimony, as summarized for the jury in exhibit 22, provided a rational basis supporting the damages award. Harrington notes a number of errors in Edgerly's estimates and a number of customers that arguably ought not to have been included in the listing. These alleged errors were all explored through Harrington's cross-examination of Edgerly and go only to the jury's determination of the weight to be given to Edgerly's testimony. Edgerly's computations of damages, if lacking in mathematical certainty, nevertheless were not speculative and provided the "reasonable certainty" we have required to support an award of damages. *See Wendward Corp. v. Group Design,* 428 A.2d 57, 61 (Me.1981).

Finally, Harrington contends that the failure of Chapman & Drake to provide documents requested by him required the trial court to grant his motion for a new trial. Harrington requested that Chapman & Drake provide him with copies of other noncompetition agreements signed by its employees. When the company refused to meet that request, Harrington failed to

---

1. We reject Harrington's additional argument of an insufficient foundation to support the admission of exhibit 22. The trial court did not abuse its discretion in determining that Edgerly's testimony as to his personal preparation of the exhibit provided an adequate foundation for its admission under M.R.Evid. 901(a). *See* Field & Murray, *Maine Evidence* § 901.2 (1987).

move under M.R.Civ.P. 37 to compel discovery. At the trial Harrington contended that he could not adequately dispute Edgerly's testimony that Harrington's noncompetition agreement was similar to those signed by other employees. The court ordered that the requested agreements be provided during the trial, and determined that the initial failure to provide them did not prejudice Harrington's case.

■ An improper failure to provide before trial materials requested through discovery procedures does not by itself compel a new trial unless the wronged party can show that the failure prejudiced his "substantial rights" and that it is "highly probable" that the verdict would have been different had the requested material been provided when sought. *See Boccaleri v. Maine Medical Center,* 534 A.2d 671, 673 (Me.1987). The content of the noncompetition agreements signed by other employees was irrelevant to whether the agreement signed by Harrington advanced Chapman & Drake's legitimate business interests and was only tangentially relevant to the reasonableness of the five-year limitation in Harrington's contract. Since those documents were made available to him during trial, however, we affirm the trial court's decision that no prejudice resulted to Harrington that would require the court to grant his motion for a new trial.

The entry is:

Judgment affirmed.

All concurring.